IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

GOOD CLEAN LOVE, INC.;                          Civ. No. 6:21-cv-01294-AA
VAGINAL BIOME SCIENCE,
INC.,

             Plaintiffs,                          **OPINION & ORDER**

    v.

EPOCH NE CORPORATION;
LAWRENCE LUO,

             Defendants.

_____

AIKEN, District Judge.

    This case comes before the Court on Defendants' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim, ECF No. 10, and Plaintiffs' Alternative Motion for Leave to Conduct Jurisdictional Discovery, ECF No. 24. The Court concludes that this matter is appropriate for resolution without a hearing. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part. Plaintiffs' Motion is DENIED as MOOT.

## LEGAL STANDARDS

### I.    Motion to Dismiss for Lack of Jurisdiction

    Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move for dismissal on the grounds that the court lacks personal jurisdiction. Plaintiff has the

burden of showing personal jurisdiction. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).

> If the district court decides the motion without an evidentiary hearing, which is the case here, then the plaintiff need only make a prima facie showing of the jurisdictional facts. Absent an evidentiary hearing this court only inquires into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction. Uncontroverted allegations in the plaintiff's complaint must be taken as true. Conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor.

*Boschetto*, 539 F.3d at 1015 (internal quotation marks and citations omitted, alterations normalized).

"In diversity cases, the court looks to the law of the state in which it sits to determine whether it has personal jurisdiction over the non-resident defendant." *IPSL, LLC v. College of Mt. St. Vincent*, 383 F. Supp.3d 1128, 1135 (D. Or. 2019); *see also Boschetto*, 539 F.3d at 1015 ("When no federal statute governs personal jurisdiction, the district court applies the law of the forum state.").

Oregon Rule of Civil Procedure 4 governs personal jurisdiction issues in Oregon. Because Oregon's long-arm statute confers jurisdiction to the extent permitted by due process, *Gray & Co. v. Firstenberg Mach. Co., Inc.*, 913 F.2d 758, 760 (9th Cir. 1990), the court may proceed directly to the federal due process analysis. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (when state long-arm statute reaches as far as the Due Process Clause, the court need only analyze whether the exercise of jurisdiction complies with due process).

To comport with due process, "the nonresident generally must have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (internal quotation marks and citation omitted). The forum state may exercise either general or specific jurisdiction over a non-resident defendant. *Boschetto*, 539 F.3d at 1016.

## II.    Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under the federal pleading standards, a pleading must contain a short and plain statement of the claim and allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a pleading does not require "detailed factual allegations," it needs more than "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 677-78. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. at 678.  Legal conclusions without any supporting factual allegations do not need to be accepted as true. *Id*.

## BACKGROUND

Plaintiffs Good Clean Love, Inc. ("Good Clean Love") and Vaginal Biome Science, Inc. are Oregon corporations with their principal places of business in Eugene, Oregon. Compl. ¶¶ 7-8. ECF No. 1.

Defendant Epoch NE Corporation is a Washington corporation licensed and doing business in the State of Washington. Compl. ¶ 9. Defendant Lawrence Luo is a resident of the State of Washington and "is a registered Governor of defendant Epoch." *Id.* at ¶ 10.

### I.    Plaintiffs' Products, Trademarks, and Trade Dress

Good Clean Love produces and distributes feminine hygiene products and organic personal lubricants, as well as oils and candles. Compl. ¶ 16. "Good Clean Love is a market leader in the organic intimate wellness space and is sold nationally and internationally in tens of thousands of stores," as well as large online retailers such as Walmart.com, Amazon.com, and Target.com. *Id.* at ¶ 17. "Good Clean Love is unique in the feminine hygiene space for its delicately balanced lubricants and restorative gels, which rely on a proprietary chemical combination of proper pH balancing, synthetic lactic acids, and iso-osmolar ingredients, which mirrors natural vaginal lubrication and secretion." *Id.* at ¶ 18. "Good Clean Love has researched and developed proprietary formulas for its products, including its Almost Naked® Lubricant," which includes "racemic (essentially meaning equal) D- and L-lactic acid components, which together with proper pH balancing and iso-osmolality (chemical

density), best mimic a healthy vaginal biome." *Id.* at ¶ 30. Good Clean Love "has attracted substantial media attention" for its products. *Id.* at ¶¶ 18-20.

Good Clean Love conducts substantial marketing to advertise its brand and products and, in addition to its website, maintains social media accounts across multiple platforms which it uses to promote its products to tens of thousands of followers. Compl. ¶ 23. Good Clean Love has spent millions of dollars on marketing, including advertising, package design, and brand design. *Id.* at ¶ 24.

Good Clean Love uses packaging to "set [itself] apart in a crowded and competitive marketplace." Compl. ¶ 25. "With some variations from product to product, Good Clean Love's packages, bottles, boxes, and tubes generally feature clean, bright green and/or bright blue coloring with simple block lettering and one word in cursive font," which Plaintiffs identify as their Trade Dress. *Id.* at ¶ 25. "Previous iterations of Good Clean Love's Almost Naked® Personal Lubricant . . . feature any combination of bright green coloring with, simple white block lettering, a square with a notch cut from the bottom right corner framing the product's name, and/or silhouettes of birds in flight," which Plaintiffs identify as their Almost Naked® Trade Dress. *Id.* at ¶ 26. Plaintiffs' Complaint includes images of the Trade Dress and the Almost Naked® Trade Dress.

Good Clean Love owns and has registered trademarks for "BiopHresh," Registration No. 6024806, as a probiotic supplement for women's health, and for "Restore," Registration No. 5517668, as a gel for use as a personal lubricant. Compl.

¶ 29.  Vaginal Biome Science owns the trademark for "Bio-Match," Registration No. 5817530, as gel for use as personal lubricant.  *Id.*

## II.    Lawrence Luo and the Distribution Agreement

In 2016, representatives of Good Clean Love met with Defendant Lawrence Luo at a trade show in Las Vegas, Nevada.  Compl. ¶ 31.  At the meeting, Luo represented "that he lived in China, had experience in the health and beauty industry, and was interested in assisting Good Clean Love's expansion into the Chinese market."  *Id.*

Good Clean Love sought to engage Luo to serve as Good Clean Love's distributor in the Chinese market.  Compl. ¶ 32.  On October 11, 2016, Luo agreed to serve as a distributor for Good Clean Love and on November 10, 2016, Epoch and Good Clean Love entered into a Distribution Agreement.  *Id.* at ¶¶ 34; Compl. Ex. 2. Luo signed the Distribution Agreement on behalf of Epoch and his signature line lists his position as vice president.  Compl. Ex. 2, at 17.

Plaintiffs allege "on information and belief" that Luo did not have the experience he represented to Good Clean Love during negotiations and that Luo agreed to serve as a distributor "for the purpose of obtaining Good Clean Love's confidential information, including product formulas and product samples, in order to unfairly compete and develop his own counterfeit brand of feminine hygiene products."  Compl. ¶ 33.

Between 2016 and 2019, Luo "struggled to establish Good Clean Love in the Chinese market" and "did not meet his target sales or obligations under the terms of

the Agreement." Compl. ¶ 42. Luo repeatedly complained to Good Clean Love that its products were arriving damaged and that Good Clean Love's products "were not getting good enough reviews for him to succeed." *Id.* "Specifically, Luo reported that Good Clean Love's products were arriving to 'grainy' or 'sandy' in texture," although no other distributors or customers reported similar issues. *Id.*

Pursuant to the Distribution Agreement, Good Clean Love sent Luo confidential and proprietary information, "including product formulas and ingredient lists, product certifications, market data, packing and design elements, and business development strategies developed by Good Clean Love over years of experience within the feminine hygiene and sexual wellness space." Compl. ¶ 43. "Good Clean Love specifically provided Luo with details regarding its research and development of products that mimic healthy vaginal biomes, including through proper pH balancing, racemic lactic acid blends, and iso-osmolar densities." *Id.* The information was provided "to encourage Luo and Epoch to increase Good Clean Love's presence in the Chinese market and allow Luo to establish relationships with Chinese customers and purchasers." *Id.*

On January 2, 2019, Good Clean Love sent a proposed addendum to the Distribution Agreement and proposed new terms upon the expiration of the Agreement. Compl. ¶ 44. In their email to Luo, Good Clean Love told Luo that he should respond by January 7, 2019 and that, if no response was made, Good Clean Love would consider the distribution partnership terminated. *Id.* Luo did not

respond and the Distribution Agreement expired by its own terms on February 6, 2019. *Id.* at ¶ 45.

## III.    Feminilove, and FeminiCare

On August 29, 2020, Epoch filed a Statement of Use for a moisturizing vaginal gel under the brand name "Feminilove," Application No. 88420993. Compl. ¶ 47. The product is labeled as "Bio-Fresh" both on the box package and the product tube itself, and the product prominently features the word "restores" in block lettering. *Id.* at ¶ 48. The packaging of Feminilove's "Restores Moisturizing Gel" says that the product "uses 'pH balance L-lactic acid and D-lactic acid balance secreted by lactobacillus," which Plaintiffs allege is "based on a formula Good Clean Love developed, protected, and disclosed to Luo and Epoch under the [Distribution] Agreement," under the Agreement's conditions regarding intellectual property and confidential information. *Id.* at ¶ 49.

Luo and Epoch market and sell the Feminilove "Restores Bio-Fresh Moisturizing Vaginal Gel" in China through at least seven different websites. Compl. ¶ 50; Compl. Ex. 3. Feminilove "Restores Bio-Fresh Moisturizing Vaginal Ge;" is also available for sale in the United States through Amazon.com. *Id.*

On August 20, 2020, Epoch filed a Trademark/Service Mark Application for "FeminiCare," application No. 90147107 with the USPTO. Compl. ¶ 53. The FeminiCare True Love Personal Lubricant product advertises itself as 95% organic and features bright green packaging with white lettering, and the product name housed in a white square with the lower right corner cut off. *Id.* at ¶¶ 53-54.

Plaintiffs have provided an image of the packaging for the FeminiCare True Love Personal Lubricant in the Complaint.

Plaintiffs allege that the features of the FeminiCare True Love Personal Lubricant packaging "are identical to the packaging of Good Clean Love's Almost Naked® Trade Dress." Compl. ¶ 54. Although Good Clean Love no longer uses the Almost Naked® Trade Dress, "there are currently many online retailers who still show that very Almost Naked® Trade Dress to consumers." *Id.* at ¶ 55; Compl. Ex. 5. In developing the FeminiCare products, Luo and Epoch have worked with the same company that performed packaging services for Good Clean Love. Compl. ¶ 52.

## DISCUSSION

Plaintiff brings claims for (1) trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) common law trade dress infringement; (3) conversion; (4) common law unfair competition; (5) common law unfair trade practices; (6) breach of contract; and (7) tortious interference with contract.

Defendants move to dismiss all claims against Defendant Luo on the basis that this Court lacks personal jurisdiction over Luo. Defendants also move to dismiss Plaintiffs' claims for common law trade dress infringement, conversion, common law unfair competition, common law unfair trade practices, breach of contract, and tortious interference on the basis that the Complaint fails to state a claim.

In their Response to the present motion, Plaintiffs withdraw their claim for common law unfair trade practices. Pl. Resp. at 21. ECF No. 23. The Court accepts

that concession and Plaintiffs' claim for common law unfair trade practices is DISMISSED.

## I.    Personal Jurisdiction

Defendants move to dismiss all claims against Luo on the basis that this Court lacks personal jurisdiction over Luo, who is a resident of Washington. Neither party asserts that Luo is subject to general personal jurisdiction and so the Court will confine its discussion to specific personal jurisdiction.

A court has specific jurisdiction where "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks and citations omitted). The Ninth Circuit uses a three-part test to determine if a party has sufficient minimum contacts to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) The claim must be on which arises out of or relates to the defendant's forum-related activities; and
>
> (3) The exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (citing *Schwarzeneggar v. Fred Martin Moroto Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

The plaintiff bears the burden on the first two parts of the test. *Picot*, 780 F.3d at 1211. If the plaintiff succeeds, "the burden shifts to the defendant to 'set forth a "compelling case" that the exercise of jurisdiction would not be reasonable.'" *Id.* at 1212 (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011)). "The primary focus of [a] personal jurisdiction inquiry is the defendant's relationship to the forum State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017).

The first prong of the Ninth Circuit's test to establish specific jurisdiction can be satisfied in two ways: either the non-resident defendant must purposefully direct his activities at the forum state, or the defendant must purposefully avail himself of the privilege of conducting activities in the forum. *Picot*, 780 F.3d at 1212. Purposeful direction, which is analyzed under the *Calder* "effects" test, is limited to claims of intentional tort. *Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007); *see Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (distinguishing between intentional action and "mere untargeted negligence"). The purposeful availment analysis, on the other hand, "is most often used in suits sounding in contract." *Boschetto*, 539 F.3d at 1016 (internal quotation marks and citation omitted).

In this case, Plaintiffs contend that the exercise of specific personal jurisdiction over Luo is proper under the purposeful direction analysis in connection with the intentional torts alleged against Luo, specifically tortious interference and the infringement of Good Clean Love's intellectual property.

### A. Jurisdiction over Luo as a Corporate Officer of Epoch

Defendants contend that the exercise of personal jurisdiction over Luo is improper because he acted as an agent of Epoch, notwithstanding Plaintiffs' argument that Luo also acted on his own behalf.

Here, the claims for trademark infringement are alleged against all Defendants and the claim for tortious interference with contract, which is alleged solely against Luo, alleges that Luo interfered with the contract between Good Clean Love and Epoch and caused Epoch to breach the contract with Good Clean Love. These claims, as alleged, are based on actions taken by Luo in his capacity as an officer and agent of Epoch.

"Jurisdiction over an individual director or officer of a corporation may not be predicated on the court's jurisdiction over the corporation itself, unless the individual maintains contacts with the forum state that would subject him to the coverage of the state's long-arm statute and comport with due process." *Blackthorne v. Posner*, 883 F. Supp. 1443, 1449 (D. Or. 1995) (internal quotation marks and citation omitted); *see also Pacific Cornetta, Inc. v. Jung*, 218 F.R.D. 250, 255 (D. Or. 2003) ("Acts taken by the [defendants] in their official capacities as representatives of the companies are insufficient to create a basis for jurisdiction. A corporate officer who has contact with a forum only in the performance of his official duties is not subject to the personal jurisdiction of the courts in that forum." (internal quotation marks and citation omitted)).

However, a "corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which her participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996); *see also Stewart v. Am. Ass'n of Physician Specialists, Inc.*, No. 5:13-cv-01670-ODW(DRBx), 2014 WL 2011799, at *4 (C.D. Cal. May 15, 2014) ("Corporate officers and directors are personally liable for all torts in which they are the primary participant, notwithstanding that they were acting as an agent of a corporation."). "The Ninth Circuit noted that 'cases which have found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct or the 'central figure' in the challenged corporate activity.'" *Stewart*, 2014 WL 2011799, at *5 (quoting *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989), alterations normalized). "Thus, a corporate officer's contact on behalf of a corporation is sufficient to subject the officer to personal jurisdiction where the officer is a primary participant in the alleged wrongdoing or has control of and direct participation in the alleged activities." *Corker v. Costco Wholesale Corp.*, 585 F. Supp.3d 1284, 1291 (W.D. Wash. 2022) (internal quotation marks and citation omitted).

Here, the Complaint alleges that Luo negotiated the contract between Good Clean Love and Epoch based on Luo's false representations concerning his experience in the Chinese market. Compl. ¶¶ 31-34. The Complaint alleges that Luo misrepresented the reaction of Chinese consumers to Good Clean Love's product in

order to induce Good Clean Love to send confidential information to Luo and Epoch to improve sales in China. Compl. ¶¶ 42-43. Instead, Luo and Epoch are alleged to have misappropriated that information in order to create, package, market, and sell an infringing competing product.

Based on these allegations, the Court concludes that Plaintiffs have sufficiently alleged that Luo was the "primary participant" and "central figure" in the alleged wrongdoings, notwithstanding the fact that he was acting as an agent and officer of Epoch. Luo's contacts with Oregon on behalf of Epoch can serve as a basis for personal jurisdiction in Oregon.

In *Corker*, the Washington district court made a similar conclusion concerning the defendant corporate officer and proceeded to assess the propriety of exercising personal jurisdiction over the defendant corporation itself. *Corker*, 585 F. Supp.3d at 1292-95. Here, that inquiry is unnecessary because Epoch consented to the jurisdiction of the federal courts of Oregon for "[a]ll disputes arising out of or in connection with" the Distribution Agreement between Epoch and Good Clean Love. Compl. Ex. 2, at 14. Defendants do not argue that this Court lacks jurisdiction over Epoch.

The Court therefore DENIES Defendants' motion to dismiss Luo for lack of personal jurisdiction. This ruling renders Plaintiffs' motion for jurisdictional discovery moot.

## II.    Failure to State a Claim

Defendants move to dismiss Plaintiffs' claims for common law trade dress infringement, common law unfair competition, conversion, breach of contract, and tortious interference on the basis that Plaintiffs have failed to state a claim. The Court will address each claim in turn.

### A. Trade Dress Infringement and Unfair Competition

Common law claims for trade dress infringement and unfair competition are generally discussed together. A claim for common law trade dress infringement mirrors claims brought under the Lanham Act. *Deckers Outdoor Corporation v. Pac. Harbors, LLC*, Case No. 3:19-cv-01587-YY, 2020 WL 5269437, at *3 (D. Or. Aug. 2020) (citing *Classic Instruments, Inc. v. VDO-Argo Instruments*, 73 Or. App. 732, 734 (1985)). "And the 'ultimate test' for unfair competition is 'the same as for federal trademark infringement,' but may 'involve a broader ranger of inquiry." *Id.* (quoting *Adidas-Salomon AG v. Target Corp.*, 228 F. Supp.2d 1192, 1201 (D. Or. 2002)).

"[T]rade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 n.3 (9th Cir. 1998). "To sustain a claim for trade dress infringement, [the plaintiff] must prove: (1) that its claimed dress is nonfunction; (2) that its claimed dress serves as a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (4) that the defendant's product or service creates a likelihood of consumer confusion." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001).

Here, Defendants assert that Plaintiffs have not articulated their trade dress. In the Complaint, Plaintiffs provide the following description of their trade dress, which is accompanied by a series of photographs of their product:

> With some variations from product to product, Good Clean Love's packages, bottles, boxes, and tubes generally feature bright green and/or bright blue coloring, with simple block lettering and one work in cursive font (the "Trade Dress") . . . Good Clean Love has updated its packaging over the years. Previous iterations of Good Clean Love's Almost Naked® Personal Lubricant, for instance, feature any combination of bright green coloring with, simple white block lettering, a square with a notch cut from the bottom right corner framing the product's name, and/or silhouettes of birds in flight ("Almost Naked® Trade Dress").

Compl. ¶¶ 25-26.

The Court concludes that Plaintiffs have provided a sufficiently detailed and vivid description of their trade dress to satisfy federal pleading standards, even without consideration of the accompanying photographs, which serve to eliminate any ambiguity.

Defendants also move to dismiss on the basis that Plaintiffs have failed to plead that their trade dress is nonfunctional. "Trade dress protection extends only to design features that are nonfunctional" and a "product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Clicks*, 251 F.3d at 1258 (internal quotation marks and citation omitted). In assessing functionality, courts consider "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether

advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Id.* at 1260 (internal quotation marks and citation omitted). "Because, ordinarily, the functionality inquiry is heavily fact-intensive, courts have held that this issue cannot be resolved at the motion to dismiss stage." *Five Star Gourmet Food, Inc. v. Ready Pac Foods, Inc.*, Case No. 5:18-cv-2436 DDP (KKx), 2019 WL 1260634, at *4 (C.D. Cal. Mar. 18, 2019). Here, the Court considers only whether non-functionality has been sufficiently pleaded and the Court concludes that it is.

Finally, Defendants argue that Plaintiffs have made contradictory arguments by asserting that their trade dress is both inherently distinctive and has acquired distinctiveness and that Plaintiff have failed to argue how their trade dress satisfies either of those possibilities. With regard to contradictory assertions, plaintiffs are entitled to plead alternative or inconsistent theories when formulating their complaint without having those theories construed as admissions against one another. *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir. 1985); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

With respect to the sufficiency of the pleading, a trade dress is inherently distinctive if it "identifies the source of the product or distinguishes it from other products." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993). A trade dress "acquires a secondary meaning when the purchasing public

associates the mark or dress with a single producer or source rather than with the product itself." *Id.*

Here, Plaintiffs have presented detailed factual allegations supporting widespread public recognition of their trade dress and its association with Plaintiffs' products as a result Plaintiffs' advertising and marketing campaigns, as well as Plaintiffs' social media efforts, media attention, and industry accolades. Compl. ¶¶ 18-24, 27-28. Plaintiffs have alleged that "when consumers see the Trade Dress on feminine hygiene products, they expect the non-toxic, healthy, and enjoyable products of Good Clean Love," and that this association is "among Good Clean Love's most valuable assets." *Id.* at ¶ 28. The Court concludes that this is more than sufficient to meet the federal pleadings standards.

Defendants do not challenge Plaintiff's showing on the final element, that Defendants' competing product creates a likelihood of consumer confusion. Upon review of the Complaint, the Court concludes that this element is likewise sufficiently pleaded.

In sum, the Court declines to dismiss Plaintiffs' claims for common law trade dress infringement and common law unfair competition.

### B. Conversion

"To state a claim for conversion, a party must establish the intentional exercise of dominion or control over a chattel that so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel." *Mossberg v. Univ. of Oregon*, 240 Or. App. 490, 494 (2011). Here, Plaintiffs

allege that Defendants "interfered with Good Clean Love's right to its own property, including its branding, packaging, Confidential Information, and Trade Dress by obtaining them, retaining them, and creating counterfeit products designed to mimic Good Clean Love's products." Compl. ¶ 74.

In essence, this claim alleges that the specific property "converted" by Defendants is Plaintiffs' intellectual property, particularly its trademarks. Oregon federal courts have, however, refused to recognize "a claim of conversion of a trademark as it would seek to displace federal trademark law." *Dynamic Mgmt. Grp., Inc. v. Univ. of Oregon*, 121 F. Supp.3d 1047, 1059 (D. Or. 2015). The court found that there was "some support for intangible property as a chattel protected by a conversion claim," but "a trademark is not even tied to tangible property such as would be the case with a copyright or patent." *Id.* "Rather it is a symbol of the good-will of its holder," and "[a]ccordingly, Oregon conversion law is inapplicable." *Id.* While the defendant might be able to assert a claim for conversion of "grant funds and tangible University resources," the "proceeds, i.e., the intellectual property developed, may not be recovered through an action for conversion as that is the exclusive province of federal copyright law." *Id.*

Here, Plaintiffs' impliedly concede the point by arguing that Defendants converted physical product samples sent to them by Good Clean Love as part of their effort to break into the Chinese market, and which Plaintiffs allege Defendants used to create counterfeit products. This allegation is not clear from the pleadings,

however, which are focused exclusively on the conversion of Plaintiffs' intangible intellectual property.

The Court therefore grants Defendants' motion to dismiss Plaintiffs' claim for conversion. Plaintiff will be granted leave to replead this claim on some basis other than conversion of intellectual property.

## C. Breach of Contract

"To state a claim for breach of contract, plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Slover v. Oregon State Bd. Of Clinical Social Workers*, 144 Or. App. 565, 570 (1996) (internal quotation marks and citation omitted).

Here, Plaintiffs allege that there was a contract between Good Clean Love and Epoch in the form of the Distribution Agreement, which contained terms prohibiting the disclosure, dissemination, or misuse of confidential information disclosed to Epoch in the course of performance under the Agreement and prohibited from Epoch from using the confidential information for any reason other than performance of the Agreement. Compl. ¶¶ 95-98. Plaintiffs allege that Epoch breached the Distribution Agreement by misappropriating Plaintiffs' confidential information in order to create and sell a counterfeit competing product in China. *Id.* at ¶¶ 101-102.

Plaintiffs also allege that the Distribution Agreement prohibited Epoch from competing with Good Clean Love in China for 18 months after the expiration of the Agreement. Compl. ¶ 106. Plaintiffs allege that Epoch breached this agreement by

marketing and selling its competing counterfeit products in China.  *Id.* at ¶ 108. Specifically, Plaintiffs allege that Epoch "marketed and sold the Feminilove 'Restores Bio-Fresh Moisturizing Gel' in China through at least seven different websites." *Id.* at ¶ 50.  Beyond the allegations of the Complaint, Plaintiffs have also provided a voluminous exhibit containing screenshots of Epoch's competing products being offered for sale on Chinese websites.  Compl. Ex. 3.

Although Defendants argue that these allegation fall short of federal pleadings standards, the Court concludes that these allegations are more than sufficient to make out Plaintiffs' claims for breach of contract.  Defendants motion to dismiss that claim is denied.

### D. Tortious Interference

To state a claim for tortious interference under Oregon law, a plaintiff must plead and prove six elements: "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995) (en banc).

Here, Plaintiffs allege that there as a contract between Good Clean Love and Epoch and that Luo interfered with that contract for an improper purpose. Defendants' motion challenges whether Luo, as an officer and agent of Epoch, was a "third party" to the contract.

Tortious interference claims serve "as a means of protecting parties against interference in their contracts from *outside* parties." *McGanty*, 321 Or. at 536 (emphasis in original). If a defendant is not a third party, but rather acting as a party to the contract (as, for instance, a corporate employee or agent), then the defendant cannot be liable for intentional interference with that contract. *Id.* at 537-38. In other words, "when an employee is acting within the scope of them employee's employment, and the employer, as a result, breaches a contract with another party, that employee is not a third part for the tort of intentional interference with economic relations." *Id.* at 538.

Here, the allegations of the Complaint are dependent on Luo acting as an officer and agent of Epoch. Plaintiffs allege that Luo acted with an improper means and an improper purpose in stealing Plaintiffs' intellectual property in order bring a counterfeit product to market. Compl. ¶¶ 112-113. But the Complaint alleges that this was done on behalf of and for the benefit of Epoch. *See, e.g., id.* at ¶¶ 4 ("After the Agreement between Epoch and Good Clean Love was terminated at the end of 2019, Good Clean Love discovered that Luo, *on behalf of Epoch*, had filed with the United States Patent and Trademark Office in an attempt to register two feminine hygiene products." (emphasis added)); 13 (asserting personal jurisdiction over Luo in Oregon "because Luo availed himself to the privileges of contracting, *on behalf of Epoch*, with a company conducting business in the State of Oregon," (emphasis added)). Plaintiffs allege that Luo negotiated the contract between Good Clean Love and Epoch and that, in the course of executing the contract, that Luo misappropriated

Good Clean Love's intellectual property so that Epoch could bring a competing counterfeit product to market.  By contrast, any allegations that Luo was acting other than as an employee and agent of Epoch are brief, conclusory, and unsupported by any alleged facts.

The Court concludes that Plaintiffs have failed to state a claim for tortious interference because they have failed to plausibly allege that Luo was a third party to the contract between Epoch and Good Clean Love.  This claim is therefore dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF No. 10, is GRANTED in part and DENIED in part.  Plaintiffs have withdrawn their claim for unfair trade practices and that claim is dismissed.  The Court DENIES Defendants' motion to dismiss all claims against Luo on the basis of lack of personal jurisdiction. The Court DENIES Defendants' motion to dismiss Plaintiffs' claims for common law trade dress infringement, common law unfair competition, and breach of contract. The Court GRANTS Defendants' motion to dismiss Plaintiffs claims for conversion and tortious interference with leave to amend.  Because the Court has determined that the exercise of personal jurisdiction is proper, Plaintiffs' Alternative Motion for Leave to Conduct Jurisdictional Discovery, ECF No. 24, is DENIED as MOOT.

Should Plaintiffs wish to replead their dismissed claims, Plaintiffs shall have thirty (30) days from the date of this Order in which to file an amended complaint.

It is so ORDERED and DATED this _____30th_____ day of March 2023.


 /s/Ann Aiken
ANN AIKEN
United States District Judge