IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

GOOD CLEAN LOVE, INC.;
VAGINAL BIOME SCIENCE,
INC.,

                    Plaintiffs,

       v.

EPOCH NE CORPORATION;
LAWRENCE LUO,

                  Defendants.

Civ. No. 6:21-cv-01294-AA

**OPINION & ORDER**

_____

AIKEN, District Judge.

      This case comes before the Court on Defendants' Motion for Partial Judgment on the Pleadings. ECF No. 36. For the reason set forth below, the Motion is GRANTED.

## LEGAL STANDARDS

      "After pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. 12(c). Because a motion for judgment on the pleadings is "functionally identical" to a motion to dismiss for failure to state a claim, the same standard of review applies to both motions. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

"Judgment on the pleadings is properly granted when there is no issue of material fact, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "However, judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citations omtted). A Rule 12(c) motion may be based on either (1) the lack of a cognizable legal theory, or (2) insufficient facts to allege a cognizable claim. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019).

The court must accept the complaint's factual allegations as true and construe those facts in the light most favorable to the non-movant, but the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion for judgment on the pleadings, a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Id.* at 570. A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

## BACKGROUND

Plaintiffs Good Clean Love, Inc. ("Good Clean Love") and Vaginal Biome Science, Inc. are Oregon corporations with their principal places of business in Eugene, Oregon. Compl. ¶¶ 7-8. ECF No. 1.

Defendant Epoch NE Corporation is a Washington corporation licensed and doing business in the State of Washington. Compl. ¶ 9. Defendant Lawrence Luo is a resident of the State of Washington and "is a registered Governor of defendant Epoch." *Id.* at ¶ 10.

Good Clean Love produces and distributes feminine hygiene and organic personal lubricants, as well as oils and candles. Compl. ¶ 16. "Good Clean Love is a market leader in the organic intimate wellness space and is sold nationally and internationally in tens of thousands of stores," as well as large online retailers such as Walmart.com, Amazon.com, and Target.com. *Id.* at ¶ 17. Good Clean Love uses packaging to "set [itself] apart in a crowded and competitive marketplace." *Id.* at ¶ 25.

Good Clean Love owns and has registered trademarks for "BiopHresh," Registration No. 6024806, as a probiotic supplement for women's health, and for "Restore," Registration No. 5517668, as a gel for use as a personal lubricant. Compl. ¶ 29. Vaginal Biome Science owns the trademark for "Bio-Match," Registration No. 5817530, as gel for use as personal lubricant. *Id.*

In 2016, representatives of Good Clean Love met with Defendant Lawrence Luo at a trade show in Las Vegas, Nevada. Compl. ¶ 31. At the meeting, Luo

represented "that he lived in China, had experience in the health and beauty industry, and was interested in assisting Good Clean Love's expansion into the Chinese market." *Id.*

Good Clean Love sought to engage Luo to serve as Good Clean Love's distributor in the Chinese market. Compl. ¶ 32. On October 11, 2016, Luo agreed to serve as a distributor for Good Clean Love and on November 10, 2016, Epoch and Good Clean Love entered into a Distribution Agreement. Compl. ¶ 34; Compl. Ex. 2.

Plaintiffs allege that Luo did not have the experience he represented to Good Clean Love during negotiations and that Luo agreed to serve as a distributor "for the purpose of obtaining Good Clean Love's confidential information, including product formulas and product samples, in order to unfairly compete and develop his own counterfeit brand of feminine hygiene products." Compl. ¶ 33.

Between 2016 and 2019, Luo "struggled to establish Good Clean Love in the Chinese market" and "did not meet his target sales or obligations under the terms of the Agreement." Compl. ¶ 42. Luo repeatedly complained to Good Clean Love that its products were arriving damaged that Good Clean Love's products "were not getting good enough reviews for him to succeed." *Id.* "Specifically, Luo reported that Good Clean Love's products were arriving to 'grainy' or 'sandy' in texture," although no other distributors reported similar issues. *Id.*

Pursuant to the Distribution Agreement, Good Clean Love sent Luo confidential and proprietary information, "including product formulas and ingredient lists, product certifications, market data, packing and design elements, and business

development strategies developed by Good Clean Love over years of experience within the feminine hygiene and sexual wellness space." Compl. ¶ 43. "Good Clean Love specifically provided Luo with details regarding its research and development of products that mimic healthy vaginal biomes, including through proper pH balancing, racemic lactic acid blends, and iso-osmolar densities." *Id.* The information was provided "to encourage Luo and Epoch to increase Good Clean Love's presence in the Chinese market and allow Luo to establish relationships with Chinese customers and purchasers." *Id.*

On January 2, 2019, Good Clean Love sent a proposed addendum to the Distribution Agreement and proposed new terms upon the expiration of the Agreement. Compl. ¶ 44. In their email to Luo, Good Clean Love told Luo that he should respond by January 7, 2019, and that, if no response was made, Good Clean Love would consider the distribution partnership terminated. *Id.* Luo did not respond and the Distribution Agreement expired by its own terms on February 6, 2019. *Id.* at ¶ 45.

On August 29, 2020, Epoch filed a Statement of Use for a moisturizing vaginal gel under the brand name "Feminilove," Application No. 88420993. Compl. ¶ 47. The product is labeled as "Bio-Fresh" both on the box package and the product tube itself, and the product prominently features the word "restores" in block lettering. *Id.* at ¶ 48. The packaging of Feminilove's "Restores Moisturizing Gel" says that the product "uses 'pH balance L-lactic acid and D-lactic acid balance secreted by lactobacillus," which Plaintiffs allege is "based on a formula Good Clean Love developed, protected,

and disclosed to Luo and Epoch under the [Distribution] Agreement," under the Agreement's conditions regarding intellectual property and confidential information. *Id.* at ¶ 49.

Luo and Epoch market and sell the Feminilove "Restores Bio-Fresh Moisturizing Vaginal Gel" in China through at least seven different websites. Compl. ¶ 50; Compl. Ex. 3. Feminilove "Restores Bio-Fresh Moisturizing Vaginal Ge;" is also available for sale in the United States through Amazon.com. *Id.*

On August 20, 2020, Epoch filed a Trademark/Service Mark Application for "FeminiCare," application No. 90147107 with the USPTO. Compl. ¶ 53. Plaintiffs allege that the features of the FeminiCare True Love Personal Lubricant packaging "are identical to the packaging of Good Clean Love's Almost Naked® Trade Dress." Compl. ¶ 54. Although Good Clean Love no longer uses the Almost Naked® Trade Dress, "there are currently many online retailers who still show that very Almost Naked® Trade Dress to consumers." Compl. ¶ 55; Compl. Ex. 5. In developing the Feminilare products, Luo and Epoch have worked with the same company that performed packaging services for Good Clean Love. Compl. ¶ 52.

## DISCUSSION

Plaintiffs bring claims for (1) trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) common law trade dress infringement; (3) common law unfair competition; and (4) breach of contract.[1]

---

[1] Plaintiffs initially brought a claim for common law unfair trade practices but withdrew that claim in the course of briefing a previous motion to dismiss. ECF No. 29. Plaintiffs also brought claims for conversion and tortious interference, but those claims were dismissed and have not been repleaded. ECF No. 29.

Defendants move for partial judgment on the pleadings, seeking dismissal of Plaintiffs' Lanham Act and trade dress infringement claims to the extent that those claims rely on conduct that occurred in China. Defendants assert that dismissal of such claims is necessitated by the Supreme Court's recent decision in *Abitron Austria GmbH v. Hetronic, Int'l, Inc.*, 600 U.S. 412 (2023), which established that the Lanham Act does not apply extraterritorially.

In *Abitron Austria GmbH v. Hetronic, Int'l, Inc.*, Abitron was initially a distributor for Hetronic but "later concluded that it held the rights to much of Hetronic's intellectual property," and undertook to reverse engineer Hetronic's products. *Abitron*, 600 U.S. at 416. Abitron then began to sell Hetronic-branded products using parts sourced from third parties. *Id.* "Abitron mostly sold its products in Europe, but it also made some direct sales into the United States." *Id.*

Hetronic brought suit against Abitron in the United States, asserting claims arising from two related provisions of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1). *Abitron*, 600 U.S. at 416. Hetronic was able to secure a substantial judgment against Abitron that accounted for Abitron's sales worldwide. *Id.* The Supreme Court took up the case to resolve a Circuit split over the extraterritorial reach of the Lanham Act. *Id.* at 417.

In *Abitron*, the Supreme Court reiterated its long-standing rules concerning the presumption against extraterritoriality, under which "exclusively foreign conduct is generally the domain of foreign law." *Abitron*, 600 U.S. at 417 (internal quotation

marks and citations omitted, alterations normalized).   Applying the presumption
against extraterritoriality involves a two-step framework:

> At step one, we determine whether a provision is extraterritorial, and
> that determination turns on whether Congress has affirmatively and
> unmistakably instructed that the provision at issue should apply to
> foreign conduct.  If Congress has provided an unmistakable instruction
> that the provision is extraterritorial, then claims alleging exclusively
> foreign conduct may proceed, subject to the limits Congress has (or has
> not) imposed on the statute's foreign application.

*Abitron*, 600 U.S. at 417-18 (internal quotation marks and citations omitted).

If a statute is not extraterritorial, courts proceed to step two, "which resolves
whether the suit seeks a (permissible) domestic or (impermissible) foreign application
of the provision." *Abitron*, 600 U.S. at 418.  In making that determination, courts
begin "by identifying the focus of congressional concern underlying the provision at
issue." *Id.* (internal quotation marks and citations omitted).  The "focus" of the
statute is "the object of its solicitude, which can include the conduct it seeks to
regulate, as well as the parties and interests it seeks to protect or vindicate." *Id.*
(internal quotation marks and citations omitted).

After identifying the focus of the statute, courts must then "ask whether the
*conduct relevant to that focus* occurred in United States territory." *Abitron*, 600 U.S.
at 418 (internal quotation marks and citations omitted, alterations normalized,
emphasis in original).  "[I]f the conduct relevant to the statute's focus occurred in the
United States, then the case involves a permissible domestic application of the
statute, even if other conduct occurred abroad," but "if the relevant conduct occurred
in another country, then the case involves an impermissible extraterritorial

application regardless of any other conduct that occurred in U.S. territory." *Id.* at 491 (internal quotation marks and citations omitted, alterations normalized). If all violations of the of the statute took place outside of the U.S., then courts do not need to consider the statutory focus at all. *Id.*

Applied to the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1), the Court held that "neither provision at issue provides an express statement of extraterritorial application or any other clear indication that it is one of the 'rare' provisions that nonetheless applies abroad." *Abitron*, 600 U.S. at 420. Accordingly, the Court concluded that §§ 1114(1)(a) and 1125(a)(1) are not extraterritorial.

With respect to the second step of the analysis, the Court determined that consideration of the "focus" of the provisions in the abstract was not useful, because the "ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus," and "the *conduct* relevant to any focus . . . is infringing use in commerce, as the Act defines it." *Id.* at 422. "Under step two of our extraterritoriality standard, then, 'use in commerce' provides the dividing line between foreign and domestic applications of these Lanham Act provisions." *Id.* "For statutes (like [the Lanham Act]) regulating conduct, the location of the conduct relevant to the focus provides a clear signal at both steps of our two-step framework." *Id.* at 425. And "[u]nder the Act, the term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, where the mark serves to identify and distinguish the mark user's goods and to indicate the source of the goods." *Id.* at 428 (internal quotation marks and citations omitted, alterations normalized).

Applied to the present case, Plaintiffs' Lanham Act claim is brought under 15 U.S.C. § 1114 and alleges that, without the consent of Good Clean Love, "Defendants have used and continue to use in commerce the Good Clean Love Marks, as described above and as depicted in paragraphs 48-50, in connection with the offering, sale, distribution, and advertising of feminine hygiene and intimate care products, which is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114." Compl. ¶ 61.

The Supreme Court has already established in *Abitron* that § 1114(1)(a) is not extraterritorial and has instructed that, when assessing claims brought under that statute, courts should look to the location of the conduct relevant to the focus of the statute, which is "the bona fide use of a mark in the ordinary course of trade."

Here, with respect to the allegations concerning the actual marketing and sale of the allegedly infringing products, Plaintiffs' allegations are generally concerned with acts occurring in China. *See* Compl. ¶ 50 ("Luo and Epoch marketed and sold the Feminilove 'Restores Bio-Fresh Moisturizing Vaginal Gel' in China through at least seven different websites."). Concerning the sale of the infringing product in the U.S., the Complaint alleges only that "Feminilove 'Restores Bio-Fresh Moisturizing Vaginal Gel' is also available in the United States through Amazon.com." *Id.* Although Plaintiffs assert that paragraph 50 of the Complaint suffices to allege that Defendants are selling the infringing product in the United States, Pls. Resp. 4, that is plainly not what is alleged. Instead, paragraph 50 alleges that the infringing product is "available" in the United States through a website. The exhibit evidencing

the sale of the infringing product through Amazon.com indicates that the seller is an entity called "Endotinn," Compl. Ex. 4, at 1, and there is no allegation that Epoch sells the infringing product in the United States.[2]  This stands in marked contrast to the preceding sentence, in which Defendants themselves are alleged to have actively "marketed and sold" the infringing product in China.

The other acts Plaintiffs point to are the meeting between Plaintiffs and Luo in Las Vegas, Compl. ¶ 31; the Distribution Agreement between Plaintiffs and Epoch, *Id.* at ¶ 34; Epoch's filing of the Statement of Use, *Id.* at ¶¶ 47-48; and the misappropriation of Plaintiffs' trade dress, *Id.* at ¶ 27.  While some of these acts are, as this Court observed in its prior Order, relevant for establishing jurisdiction, they do not serve to support an allegation that the conduct relevant to the Lanham Act's focus—the bona fide use of a mark in the ordinary course of trade—occurred in United States territory.

Plaintiffs also seek to distinguish this case from *Abitron* on the ground that *Abitron* involved a dispute between an American company and a group of foreign companies, while the present case involves a dispute between American companies. The Court fails to see how that distinction is meaningful, as the Supreme Court's holding in *Abitron* focused on the location of the relevant conduct, rather than the location or national affiliation of the alleged tortfeasors.  As the Supreme Court

---

[2] Plaintiffs assert that they have alleged that Defendants were selling the infringing product in the United States and China, citing to paragraph 47 of the Complaint.  Pl. Resp. 2-3, ECF No. 42.  No such allegation is found in paragraph 47 of the Complaint, which alleges that Epoch filed a Statement of Use with the USPTO for the infringing product under the brand name "Feminilove." Compl. ¶ 47.

observed: "In nearly all countries, including the United States, trademark law is territorial," and "each country is empowered to grant trademark rights and police infringement within its borders." *Abitron*, 600 U.S. at 426. "It thus bears repeating our longstanding admonition that the United States law governs domestically, but does not rule the world." *Id.* at 428 (internal quotation marks and citation omitted). Accordingly, the Court concludes that the fact that the alleged infringement involved two U.S. companies does not alter the *Abitron* analysis when the alleged violation of the Lanham Act occurred outside the United States. *See Warner Bros. Ent. Inc. v. Loyd*, No. CIV 20-0062 JB/JFR, 2023 WL 5727468, at *109 (D.N.M. Sept. 5, 2023) ("While *Abitron* is distinguishable from this case because it involves non-United States citizens infringing trademarks abroad, the Court has no sound reason to believe the Supreme Court would have decided that case differently if its facts more closely resembled this case.").

Although there are some limited references to domestic conduct involving commerce in the Complaint, the Supreme Court cautioned that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated into its kennel whenever *some* domestic activity is involved in the case." *Abitron*, 600 U.S. at 426 (internal quotation marks and citation omitted). In this case, the allegations concerning domestic infringing conduct are simply insufficient to survive in light of *Abitron* and so Defendants' Motion for Partial Judgment on the Pleadings will be granted with respect to Plaintiffs' Lanham Act claim, insofar as that claim seeks relief for conduct that took place in China.

Finally, the Court turns to the portion of Defendants' motion which seeks dismissal of Plaintiffs' common law claim for trade dress infringement. Defendants make, essentially, the same arguments as were made in their challenge to the Lanham Act claim, pointing out that there are no allegations that Defendants have marketed or sold a product infringing Plaintiffs' trade dress in the United States. Plaintiffs have not responded to Defendants' arguments on this issue. The Court notes that this claim arises from common law and so the *Abitron* decision's focus on congressional intent and statutory focus are of limited utility. However, a claim for trade dress infringement under Oregon law "mirrors the claim under the Lanham Act." *Deckers Outdoor Corp. v. Pacific Harbors, LLC*, Case No. 3:19-cv-01587-YY, 2020 WL 5269437, at *3 (D. Or. Aug. 10, 2020). And the Court concludes that much of the reasoning underpinning the *Abitron* decision and the presumption against extraterritorial application, particularly regarding the territorial nature of intellectual property rights, applies with equal force to a common law claim for trade dress infringement. The Court therefore grants Defendants' motion with respect to Plaintiffs' common law trade dress claim, insofar as that claim seeks to recover for infringement of Plaintiffs' trade dress in China.

Plaintiffs have requested leave to amend their complaint to remedy any defects and reframe their claims to conform with the Supreme Court's decision in *Abitron*. The Court concludes that leave should be granted. Plaintiffs shall have thirty days from the date of this Order in which to file an amended complaint.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Judgment on the Pleadings, ECF No. 36, is GRANTED. Plaintiffs' Lanham Act claim and Plaintiffs' claim for common law trade dress infringement are dismissed, to the extent that they seek to recover for conduct that occurred in China. Plaintiff's request for leave to file an amended complaint is GRANTED and Plaintiffs shall have thirty (30) days from the date of this Order in which to file an amended complaint.

It is so ORDERED and DATED this ___23rd___ day of May 2024.


 /s/Ann Aiken
ANN AIKEN
United States District Judge